STATE OF NEBRASKA, APPELLEE, V. PATRICK H. HANKINS,
APPELLANT.
441 N.W.2d 854

Filed June 23, 1989.    No. 88-309.

Jeffrey A. Silver for appellant.

Robert M. Spire, Attorney General, and Susan M. Ugai for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Defendant-appellant, Patrick H. Hankins, pled not guilty or, alternatively, not responsible by reason of insanity, to each of three counts of murder in the first degree in violation of Neb. Rev. Stat. § 28-303(1) (Reissue 1985). Pursuant to verdict, he was adjudged guilty as charged and sentenced to life imprisonment on each conviction, the sentences to be served consecutively. In his appeal to this court, Hankins, in summary, assigns as trial error the (1) giving and refusal to give the venire certain advice; (2) receipt of certain evidence; (3) rejection of certain evidence; (4) denial of access to the psychological records of a State witness; (5) failure to grant a mistrial because of the State's cross-examination; (6) failure to sustain Hankins' motions for a directed verdict or dismissal, and finding the evidence sufficient to support the verdicts; (7) giving of certain instructions; (8) refusal to give a requested instruction; (9) failure to grant Hankins surrebuttal during closing argument; (10) failure to find Neb. Rev. Stat. § 29-2203 (Reissue 1985) unconstitutional; and (11) failure to declare a mistrial or grant a new trial because of the State's withholding of information. We affirm.

## I. FACTS

The bodies of the three victims, Barbara Cook, her son Kevin Cook, and her daughter Danae Cook, were found in the daughter's apartment in Omaha on Sunday, October 4, 1987, at about 4 p.m. by Paul Haws, a friend of the family.

Both Hankins and Danae Cook had possessed keys to the apartment, as the two had been living together platonically for about a month and a half prior to the killings. Barbara Cook and Kevin Cook lived in Colorado but were staying with Danae Cook on the weekend of October 3 and 4.

Haws testified that on October 3, Hankins and Barbara Cook had a dispute. Barbara Cook had given Hankins a $20 bill

to buy beer, and Hankins failed to return the change. When he did return the change, he left the apartment "[a] little embarrassed" and in a hurry. Haws spent the night of October 3 and the early morning of the next day watching videotaped movies with Barbara and Dawn Cook, another of Barbara Cook's daughters, and several others at Dawn Cook's apartment. At 1 a.m. on October 4, Barbara Cook gave Haws a ride home and told him she planned to go to Danae Cook's to sleep.

Danae Cook worked at her job as a waitress until 4 a.m. the morning of October 4. After work, she gave a coworker a ride home and then met another coworker for hot chocolate. This latter coworker testified that Danae Cook left for home a little before 5 a.m.

Haws had planned to picnic with the Cook family and other friends on October 4; thus, at 11:30 a.m. that day, he and a friend went to Danae Cook's apartment building, where they met Dawn Cook and others. They knocked at Danae Cook's locked apartment door but were unable to get an answer. Haws noticed that Danae Cook's automobile, a brown Monte Carlo, was missing from the parking lot of the apartment building but that both Barbara Cook's and Hankins' vehicles were there.

At about 4 p.m., after trying unsuccessfully throughout the day to get an answer at Danae Cook's apartment or otherwise locate the Cooks, Haws climbed up to the balcony at the rear of the apartment and entered through the unlocked sliding glass door. He then discovered the three bodies. Each body was covered with a blanket and had a pillow over its head. Barbara Cook's body was on the bed in the bedroom, Danae Cook's body was on the couch in the living room, and Kevin Cook's body was on the living room floor. Danae Cook's purse was turned upside down on the floor of the living room, and her automobile keys were missing. Hankins' clothing had also been removed from the apartment. Neither Haws nor Dawn Cook had seen Hankins all day.

Police investigators discovered a metal bar in the apartment, described as a "chrome plated rod or pipe that has a steel rod inserted and welded into one end of it measur[ing] 31 and a half inches long. Outside diameter is an inch and a quarter, and

inside diameter is one inch." The metal bar weighs about 5 pounds. An investigator for the Omaha Police Division's homicide assault unit testified that blood splatters found in the apartment were consistent with the use of the bar as the murder weapon.

The investigator further testified it appeared that the pillow covering Kevin Cook's head had been used to wipe a bloody object. The only fingerprint found on the bar was identified as Hankins'. A forensic serologist testified that blood detected on the bar was consistent with Kevin Cook's blood group, that Kevin Cook's blood could mask the existence of Danae Cook's blood, which may also have been on the bar, and that, most likely, the blood which was detected came from the last person who came into contact with the bar. The blood on the pillow where it appeared a bloody object had been wiped was also consistent with Kevin Cook's blood group. One blond hair, which "exhibited characteristics which were similar to that of Danae Cook," was found on the small end of the metal bar.

A pathologist examined the bodies at 9:30 p.m. on the day they were found; he testified that the victims had been dead at least 12 hours and possibly longer. He further testified that each victim's injuries were essentially identical and that the death of each was the result of numerous head injuries produced by multiple blows of considerable force from a heavy blunt instrument. Such injuries, he opined, were consistent with being produced by the metal bar described earlier.

On October 9, Danae Cook's automobile was found in New Mexico. Police there pursued the automobile off a highway because the driver had reportedly stolen some gasoline. The automobile was later discovered in a pasture, but the driver was not located. A jacket bearing Hankins' initials was discovered in the vehicle, and Hankins' fingerprints were found both on the vehicle and on an object inside the vehicle.

Hankins was eventually located when he, on October 11, called the Amarillo, Texas, police department from a truckstop, telling them he was wanted for theft. When Officer Glenda Utsey, a patrol officer for the city of Amarillo, arrived at the truckstop, Hankins identified himself. Utsey asked him, "What makes you think you are wanted?" Over Hankins'

objection, the court allowed Utsey to testify that Hankins asked to go outside and, on the way to the patrol vehicle, told the officer, "I killed a lady in Omaha, beat up two others real bad, stole a car, ran to New Mexico. There, I ran from the police, wrecked the car and hitchhiked back to Amarillo." Utsey then patted down Hankins and placed him in the back seat of the patrol vehicle without arresting him. Over the radio, Utsey discovered Hankins was indeed wanted and placed him under arrest but did not advise him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Utsey next transported Hankins to police headquarters. Utsey testified that in the police vehicle Hankins made several spontaneous statements:

He asked me what kind of engine my car had in it, how fast it ran, he told me how fast he drove the Monte Carlo, that it had a big 454 engine in it, and that he hadn't eaten in a couple days, and that he had a big craving for Pepsi, and so he decided that after he hitchhiked to Amarillo, eat him a big meal and drink Pepsi and turn himself in, and that after he had done the crime in Omaha he thought about stealing Danae's mother's Subaru station wagon, a new model station wagon, and he couldn't find the keys, he decided to take the Monte Carlo with the 454, ran faster.

At police headquarters, Utsey advised Hankins of his rights under *Miranda* and ascertained that he understood each of them. As required by Texas law, she specifically advised him of his right to terminate the interview at any time. Hankins then signed a form stating he had been advised of the aforedescribed rights.

Utsey testified that no promises were made to Hankins, and no threats or other coercion was exercised over him. Utsey further stated that Hankins appeared physically and mentally alert, not hungry, thirsty, sleepy, or under the influence of any drugs, and appeared to give his statement voluntarily, knowingly, and intelligently. During the course of the interrogation, Hankins did complain that his legs hurt, but said he was "okay." At times, Hankins appeared nervous, disturbed, and depressed. At no time during the interview did Hankins request the advice of an attorney.

Hankins then gave Utsey a statement, which was later reduced to writing. The written statement, which was received in evidence over Hankins' objection, reads:

On Sunday, October 4th, 1987, between 6:30 a.m. and 7 a.m., I was at an apartment located approximately at 96th and Q Street in Omaha, NE. The apartment belonged to a friend of mine identified as Danay [sic] Cook, WF, approximately 18 years old. Danay's [sic] mother, Barbara Cook, WF, approximately 38 years old, and her brother Kevin Cook, WM, approximately 17 years old, were visiting Danay [sic] from Denver, Co. I had been sleeping on the floor in the living room. When I woke up that morning on 10-04-87, I was feeling depressed and thinking about a lot of things. I got up, went into the dining room and picked up my winch bar, walked into the bedroom and started beating Danay's [sic] mother Barbara Cook while she was sleeping. After I finished, I went into the living room and started beating Danay [sic] which was asleep on the couch and Kevin which was asleep in the floor. After I finished, I wiped the blood off the winch bar and put it back in the dining room. Then I went and got both females [sic] purses, took all the money out of the purses and Danay's [sic] car keys to her 1974 brown Monte Carlo. I put all of my belongings into the car and started driving on the first interstate I saw. I followed I-29 out of Omaha into Iowa, south thru Missouri, then I went as far as the top of northern part of Arkansas in the Ozark's [sic]. From there I went west on an unknown route . . . .

. . . Whenever I was going thru New Mexico the police started chasing me. I finally crashed the car several miles off of the highway and left it at the scene so I could get away from the police on foot. From there I went to a rest stop and hitched a ride to Amarillo from a truck driver. After I reached Amarillo about 7:30 a.m. on 10-10-87 the trucker dropped me off at Hwy 60. From there I walked to the Union 76 Truck Stop which was about 11:00 a.m. I sat out there all day and watched tv ordered some food to eat, then decided to call the police and turn myself in because I knew I was probably wanted. I knew I had probably killed

one of the persons I beat. I just didn't know who.

Omaha Police Officer James Wilson also interviewed Hankins at the Amarillo police station. Prior to doing so, Wilson advised Hankins of his *Miranda* rights and determined that he understood each right. Hankins then indicated that he was willing to make a statement and gave a statement which Wilson tape recorded. While making the recording, Wilson again gave Hankins the *Miranda* warnings and ascertained on the recording that, understanding each right, Hankins was nevertheless willing to continue. Hankins also agreed during the recording that the police had not mistreated or threatened him, that he had been given breakfast, and that no promises had been made to him. Wilson confirmed that Hankins was not promised anything nor threatened or coerced, and testified that Hankins appeared to give his statement knowingly and voluntarily; that he appeared calm and cooperative, physically and mentally aware; and that he did not appear to be hungry, thirsty, sleepy, or under the influence of any drug. While making the statement, Hankins was polite and calm but several times became "emotionally distraught." At no point during the interview did Hankins refuse to answer questions or ask for an attorney.

The trial judge, over Hankins' objection, received the recording in evidence and permitted the State to play it for the jury. The recorded statement is substantially the same as the written statement Hankins had given Utsey. However, in response to Wilson's questions, Hankins revealed further information. Hankins indicated that he had no idea what possessed him, saying, "I think I was just pissed off at myself" and "depressed." Hankins described the "winch bar" he used to hit the victims as

> about two or three feet long, it is chrome plated, it's — the handle has grooves on it to where you put your hands on one end. It is smooth from there down to the other end which is solid steel or solid iron with a kind of pointed jag on the end of it.

Hankins stated that after the killings, he wiped the bar on a pillow and placed pillows over the faces of the three victims. He further stated that because his automobile was "a piece of

crap," he searched for the keys to Barbara Cook's vehicle because he knew it would go furthest. Because he could not find those keys, he took Danae Cook's automobile.

Larry Roberts, commander of the homicide assault unit of the Omaha police, stated that information about the cause of the Cooks' deaths and the identification of the murder weapon were withheld from the news media to ensure that when Hankins was interviewed, the information he revealed would not be the result of press disclosures.

Several psychiatrists testified as to Hankins' mental state at the time of the killings. Called by Hankins, Dr. Donald Swanson, who had examined Hankins 3 months before the killings, diagnosed him as having a schizotypal personality disorder, and stated his condition could deteriorate into schizophrenia. Dr. David Kentsmith, who did not examine Hankins until after the killings, diagnosed him as a schizophrenic, undifferentiated type. According to Kentsmith, that disease requires hospitalization and extensive treatment and involves hallucination and a defective ability to feel emotion and relate to others and the environment. Kentsmith's opinion was that at the time of the crimes, Hankins was legally insane, "he did not know right from wrong, he did not understand the consequences of his act, and he didn't realize . . . that he deserved punishment for them."

The State called two psychiatrists. Dr. John Riedler testified Hankins is paranoid, suspicious, and suffers from a personality disorder, but opined that at the time of the crimes, Hankins was sane and had sufficient mental capacity to understand what he was doing, to comprehend the nature and quality of the acts, to distinguish between right and wrong, and to know his acts were wrong and deserving of punishment. Dr. William Logan diagnosed Hankins as having a borderline personality disorder, and agreed with Riedler that at the time of the crimes, Hankins was sane and had the mental capacity to form intent, to deliberate, to understand the nature of the crimes, to understand he could be punished for them, and to distinguish between right and wrong.

In addition, Dr. Bruce Buehler, a physician board certified in pediatrics and clinical and biochemical genetics and board

eligible in developmental medicine, called by Hankins, testified that Hankins suffered from brain damage as the result of his mother's use of the drug Tridione for epilepsy during her pregnancy, so that Hankins' mental capacity was below average. Logan, however, disagreed and opined that if Hankins had organic brain damage, it was not significant.

Dawn Cook, who was acquainted with Hankins as a friend of the family, never knew him to be violent or to have threatened any of the Cooks. He and Kevin Cook "were like brothers at times." She testified, however, that just before the killings, Hankins' "moods were swinging towards depression, anger" and that her sister "was more nervous and wanted to stay away more from the apartment." According to Dawn Cook, Hankins' relationship with her family deteriorated because of the money incident described by Haws.

The record also establishes that Danae Cook had been dating Russell Stortz. According to Dawn Cook, Stortz abused Danae Cook, had a volatile relationship with the Cook family, and had threatened to kill Dawn, Kevin, and Barbara Cook. Danae Cook told a friend the night before her death that she planned to break up with Stortz, and Stortz and Danae Cook were seen arguing outside her workplace on the morning of October 3. Stortz, however, denied ever threatening the Cook family and considered himself very protective of Danae Cook. When told about the killings, Stortz displayed extreme emotion; in his words, "I broke down. I lost it."

## II. ANALYSIS
### 1. Venire Advice

In connection with the first summarized assignment of error, Hankins contends that the trial judge committed prejudicial error in, over objection, informing those sworn as prospective jurors that although, as jurors, they would have no role in sentencing Hankins if he should be convicted of murder, they should nonetheless be aware that a possible consequence of such a conviction would be the court's imposition of a sentence of death. In addition, Hankins claims that in view of that advice, the trial judge erroneously refused to inform the jury of the dispositional consequence of a verdict of not responsible by

reason of insanity.

### a. *Advice as to Sentence*

After advising the jury about the potentiality of a sentence of death, the trial judge asked that any venireperson who, with that knowledge, could not in good conscience "take the oath to decide the case on the law and the facts to the exclusion of any other consideration, please stand now" so that he might visit with such venireperson individually. No venireperson stood.

Hankins' claim that the trial judge's comments were improvident because they produced a more conviction-prone jury than would otherwise be the case has been rejected by both the U.S. Supreme Court and this court. It is entirely permissible to exclude from jury service those whose views on capital punishment are such as to "prevent or substantially impair" their ability to impartially apply the law to the evidence. *Lockhart v. McCree*, 476 U.S. 162, 174, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986); *State v. Bird Head*, 225 Neb. 822, 408 N.W.2d 309 (1987); *State v. Burchett*, 224 Neb. 444, 399 N.W.2d 258 (1986) (quoting *Lockhart v. McCree*). No useful purpose would be served by restating the analyses contained in the foregoing cases. We are constrained, however, to point out that, here, none of the venirepersons responded to the trial judge's comments, and apparently none of them were excluded as a result of the information the venire was given.

### b. *Disposition If Not Responsible Because of Insanity*

In a related argument Hankins further contends that if a venire is told of the possibility of a sentence of death, it must also be told of the disposition to be made of a defendant found not responsible by reason of insanity. Without citing authority, Hankins argues that such advice is "a natural extension of death-qualifying a jury." Brief for appellant at 45.

Neb. Rev. Stat. § 29-2006(3) (Reissue 1985) provides that it is good cause to challenge one called for jury service in a capital case if his or her opinions are such as to prevent "finding the accused guilty." *State v. Bird Head, supra*. Accordingly, the venire may be examined to determine whether any juror has conscientious scruples against capital punishment such as to

prevent or substantially impair the performance of his or her duties as a juror. *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984), *cert. denied* 469 U.S. 1028, 105 S. Ct. 447, 83 L. Ed. 2d 372. See, also, *State v. Bird Head, supra*.

In *State v. Rowe*, 210 Neb. 419, 315 N.W.2d 250 (1982), *appeal after remand* 214 Neb. 685, 335 N.W.2d 309 (1983), we impliedly held that a juror is disqualified and may be challenged for cause where his or her verdict will be affected by an awareness that an accused found not guilty by reason of insanity might soon be released. We declared that a juror who cannot subordinate his or her personal views on an issue of law and obey the law in deciding the case must be excused for cause. See, also, *State v. Benzel*, 220 Neb. 466, 370 N.W.2d 501 (1985); *State v. DeJesus*, 216 Neb. 907, 347 N.W.2d 111 (1984); *State v. Reeves, supra*. The defendant, like the prosecution, has the right to put pertinent questions to prospective jurors to ascertain if there is ground for challenge for cause. *Oden v. State*, 166 Neb. 729, 90 N.W.2d 356 (1958).

The true object of challenges to the venire, either peremptory or for cause, is to enable parties to avoid disqualified persons and secure an impartial jury. *State v. Rife*, 215 Neb. 132, 337 N.W.2d 724 (1983), *cert. denied* 464 U.S. 1070, 104 S. Ct. 977, 79 L. Ed. 2d 215 (1984). Consequently, the principal purpose of voir dire examination is to ascertain whether the proposed juror is free from bias or prejudice, and whether he or she is in such attitude of mind with respect to the case in hand that he or she would be a fair and impartial juror. *Oden v. State, supra*.

As the State points out, nothing prevented Hankins from conducting voir dire on the issue of whether prejudice against the defense of insanity, Hankins' possible commitment to a psychiatric hospital, or the possibility that Hankins might soon be released if found not responsible by reason of insanity would "prevent or substantially impair" any juror's ability to impartially apply the law to the facts of the case. As counsel has the right to interrogate prospective jurors so as to elicit desired information before accepting the venire, *Medley v. State*, 156 Neb. 25, 54 N.W.2d 233 (1952), the trial judge did not err in refusing to do so himself.

## 2. Evidence Received

In connection with the second summarized assignment of error, Hankins contends that the trial judge erred in admitting the inculpatory statement he made and in admitting certain pictorial evidence.

### a. *Inculpatory Statements*

Hankins makes four arguments for excluding the inculpatory statements which the trial judge admitted over objection as detailed in part I. First, he argues that Utsey's question, "What makes you think you are wanted?", was custodial interrogation requiring preadvisement of rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and because Utsey did not first give the *Miranda* warnings, his answer was inadmissible and all of Hankins' subsequent statements to the police were "fruits of the poisonous tree."

Hankins correctly asserts that under *Miranda*, a custodial statement may not be received in evidence unless the defendant was first advised (1) of the right to remain silent, (2) that anything said can and will be used against the defendant in court, and (3) of the right to consult with a lawyer, retained or court-appointed, and to have a lawyer present during interrogation. *State v. Barnes*, 230 Neb. 949, 434 N.W.2d 516 (1989); *State v. Gibson*, 228 Neb. 455, 422 N.W.2d 570 (1988).

Hankins' argument, however, overlooks the fact that he was not in custody at the time he answered Utsey's question outside the truckstop. Utsey had not placed Hankins under arrest, and, as she testified, Hankins was free to leave at that time. Custodial interrogation has been characterized by the U.S. Supreme Court in *Miranda v. Arizona, supra* at 444, as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *State v. Gibson, supra*. The *Miranda* warnings are required before interrogation only when there has been a restriction on a person's freedom so as to render such person in custody. *State ex rel. NSBA v. Douglas*, 227 Neb. 1, 416 N.W.2d 515 (1987), *cert. denied* ____ U.S. ____, 109 S. Ct. 31, 102 L. Ed. 2d 10 (1988); *State v.*

*Brown*, 225 Neb. 418, 405 N.W.2d 600 (1987). The mere fact that an investigation has focused on a suspect does not trigger the need for the *Miranda* warnings in a noncustodial setting. *State v. Brown, supra*.

Secondly, Hankins argues that because Wilson failed to advise him of the rights Texas law specifically requires beyond those required by *Miranda* (for example, the right to terminate the interview at any time, see Tex. Code Crim. Proc. Ann. art. 38.22, § 2 (Vernon 1979)), Hankins' taped confession to Wilson was inadmissible in the Nebraska court.

The same issue was confronted in *People v. Benson*, 88 A.D.2d 229, 454 N.Y.S.2d 155 (1982). There, the defendant similarly argued that because New York officers took his confession in Texas, Texas law governed the rights of which the defendant had to be advised and thus the admissibility of his confession in the New York court. The court noted that, generally, the law of the forum determines the admissibility of evidence. The court held that the law of New York, and not the law of Texas, governed the application of *Miranda* to the defendant's confession and thus its admissibility in the New York court.

> It is well established that "the *Miranda* rule evolved solely as a procedural safeguard to protect the accused's privilege against compulsory self incrimination . . . . " . . . Beyond a strictly procedural approach, however, it is clear that this State's law governs since New York has a paramount interest in the application of its laws to this case . . . . Here, New York police officers obtained a statement for use in a New York proceeding emanating from a violent crime in New York. Application of the exclusionary rule would not serve any useful purpose since Texas authorities were not involved. Indeed, exclusion of the subject statement would serve to undermine the good faith efforts of the New York police in complying with the *Miranda* standards.

(Citations omitted.) 88 A.D.2d at 231, 454 N.Y.S.2d at 157. It is clear that under both Nebraska and federal law, Wilson, a Nebraska police officer, properly advised Hankins of his *Miranda* rights, and Hankins voluntarily waived them.

Thirdly, Hankins argues that his waiver of the *Miranda* rights was not intelligent in that, according to psychiatric expert Logan, Hankins was suffering from a personality disorder and, as such, was more likely to be mentally confused in a period of emotional turmoil. Nevertheless, we note that Logan testified that despite Hankins' personality disorder, at the time of the killings he was capable of understanding the nature and quality of his actions. We further note that no expert testified as to Hankins' mental condition at the time he made his confessions.

The test for determining whether a defendant acted intelligently regarding any *Miranda* right is whether, at the time of the waiver, the defendant possessed the capacity to understand and act in response to the warnings given by an interrogating officer. *State v. Rowe*, 228 Neb. 663, 423 N.W.2d 782 (1988). Hankins appeared to understand the rights read to him and gave his confession coherently. Thus, the trial judge had sufficient evidence to determine that Hankins possessed the mental capacity to understand and act in response to the warnings.

Finally, Hankins appears to argue that his statements at the Amarillo police station were not voluntarily made, again basing his argument on his mental condition at the time of the confessions. This argument was recently considered by the U.S. Supreme Court in *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). There, the defendant, similarly claiming that his confession to murder was not voluntary, introduced the testimony of a psychiatrist at a hearing to suppress the confession. This psychiatrist testified that the defendant was suffering from chronic schizophrenia and had been in a psychotic state since the day before his confession. The Court held that coercive police conduct is a necessary predicate to the finding that a confession is not voluntary within the meaning of the due process clause of the 14th amendment. The Court explained:

> Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law. Respondent correctly notes that as interrogators have turned to more subtle forms of psychological persuasion,

courts have found the mental condition of the defendant a more significant factor in the "voluntariness" calculus. See *Spano v. New York*, 360 U. S. 315[79 S. Ct. 1202, 3 L. Ed. 2d 1265] (1959). But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness."

479 U.S at 164.

The Court further stated:

We think the Constitution rightly leaves this sort of inquiry to be resolved by state laws governing the admission of evidence and erects no standard of its own in this area. A statement rendered by one in the condition of the respondent might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum, see, *e. g.*, Fed. Rule Evid. 601, and not by the Due Process Clause of the Fourteenth Amendment. "The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false." *Lisenba v. California,* 314 U. S. 219, 236 [62 S. Ct. 280, 86 L. Ed. 166] (1941).

479 U.S. at 167.

In Nebraska, we have held that to be admissible in evidence, an accused's statement, admission, or confession must have been freely and voluntarily made, and must not have been the product of or extracted by any direct or implied promise or inducement, no matter how slight. *State v. Hayes*, 229 Neb. 53, 424 N.W.2d 624 (1988).

A determination by the trial judge that a confession has been voluntarily made will not be overturned on appeal absent an abuse of discretion. *State v. Clark*, 228 Neb. 599, 423 N.W.2d 471 (1988). The record is devoid of any evidence of coercive police conduct. Both Utsey and Wilson testified that Hankins was not promised anything, threatened, or subjected to any other improper influence. Hankins himself stated on the tape that he received neither threat nor promise. The trial judge did not abuse his discretion in determining that Hankins'

confession was admissible.

### b. Pictorial Evidence

Before trial, Hankins filed a motion in limine to exclude from evidence certain photographs depicting the victims' bodies, their location, and the location of blood splatters found at the crime scene, as well as certain photographic slides of the victims' injuries. The trial judge overruled both this motion and Hankins' objections during trial, except as to three crime scene photographs. Hankins now argues that the pictorial evidence admitted is unfairly prejudicial and thus should have been excluded pursuant to the provisions of Neb. Rev. Stat. § 27-403 (Reissue 1985).

We have held that in a homicide case photographs of the victim are admissible, even if gruesome, provided a proper foundation is laid and they are received for purposes of identification, to show the condition of the body or the nature and extent of the wounds, or to establish malice or intent, particularly in conjunction with the examining pathologist's testimony. *State v. Parsons*, 226 Neb. 543, 412 N.W.2d 480 (1987); *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983). In other words, the gruesome nature of photographs alone will not keep them from the trier of fact, so long as the probative value is not outweighed by the prejudicial effect. *State v. Parsons, supra.*

There is no claim that foundation was lacking for any of the pictorial evidence received. The photographs of the crime scene depicting the position of the bodies and location of various blood splatters corroborated Hankins' confession. The photographic slides of the victims' bodies were used by the pathologist to explain the nature and extent of the wounds and to demonstrate that such wounds could have been produced by the metal bar Hankins confessed using in the killings.

The admission or exclusion of evidence is a matter within the discretion of the trial court, whose ruling will not be disturbed on appeal absent an abuse of discretion. *State v. Sardeson*, 231 Neb. 586, 437 N.W.2d 473 (1989); *State v. Sutton*, 231 Neb. 30, 434 N.W.2d 689 (1989). The trial judge did not abuse his discretion in admitting the pictorial evidence about which

Hankins complains.

### 3. Evidence Rejected

The third summarized assignment of error complains that the trial judge rejected evidence concerning Danae Cook's alleged drug use and her pregnancy and miscarriage immediately prior to her death.

#### a. *Alleged Drug Use*

Before trial, the State filed a motion in limine to exclude from evidence certain information from a confidential informer "relating to alleged drug activities on the part of the decedent Danae Cook" on the bases that "[s]uch evidence is highly prejudicial, of low probative value and dubious reliability and would tend to confuse the issues" and that the evidence involves hearsay. The State invoked its privilege not to reveal the identity of the informer. An in camera hearing was held, after which the trial judge overruled the State's motion, but also denied Hankins' request to have the informer's identity disclosed pursuant to Neb. Rev. Stat. § 27-510 (Reissue 1985) by ordering all present at the hearing on the motion not to reveal "what went on at this hearing without an order of the court." Hankins claims that Danae Cook's alleged drug involvement was relevant to show that her death may have been drug related.

Under § 27-510, the trial judge, after determining that the evidence of an informer may be relevant ("necessary to a fair determination of the issue of guilt or innocence"), holds an in camera hearing, such as the one had here, to determine whether "there is a reasonable probability that the informer can give the testimony." The trial judge need not require that the informer's identity be disclosed if it is determined that the informer would be unable to give the testimony. In overruling the State's motion, the trial judge implicitly determined that although the evidence relating to Danae Cook's drug involvement might be relevant, the informer's identity did not have to be disclosed, as she would be unable to give the testimony.

At the hearing, Deputy County Sheriff Daniel McGovern testified that he had talked to a confidential informer concerning Danae Cook's possible involvement with drugs. The

confidential informer had indicated in the first interview that she was present when a Jeffrey Opsatnich told a group of people that Danae Cook was killed because she "owed the dealer a lot of money." However, McGovern testified that the informer said during a second interview that Opsatnich was her only source for this information, that Danae Cook had never told her about drug involvement, and that, in fact, she did not know Danae Cook personally.

Hankins offered McGovern's police report, which recites: "[T]he confidential source was also well acquainted with the deceased and verified that she distributed drugs." However, McGovern explained that "well acquainted" and "verified" were his words and that, in fact, the informer said only that she had seen Danae Cook before, went to school with her, and had no personal knowledge that Danae Cook was involved in drugs. Hankins' attorney himself stated at the hearing that when interviewed, Opsatnich "said he never said anything about drugs or anything of that nature, and that he didn't have any idea what I was talking about . . . ."

On this state of the record, the trial judge did not abuse his discretion in concluding that the informer had no personal knowledge that Danae Cook was involved in drugs and therefore could not supply the testimony at trial, as it would be hearsay. Thus, there was no error in denying Hankins' request to have the informer identified.

### b. *Pregnancy and Miscarriage*

During trial, Hankins made an offer of proof that, if permitted, Stortz would testify that 2 days before the killings, Danae Cook told him she had miscarried their baby, and that he was certain he was the father. The State objected to the evidence because of a lack of relevance and unfair prejudice, confusion, and misleading of the jury. The trial judge sustained the State's relevancy objection, and Hankins now claims the ruling as error, asserting the evidence is relevant to show that Stortz had motive to kill Danae Cook.

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action appear more probable or less

probable than it would appear without the evidence. *In re Interest of Adams*, 230 Neb. 109, 430 N.W.2d 295 (1988); *State v. Wells*, 229 Neb. 89, 425 N.W.2d 338 (1988); Neb. Rev. Stat. § 27-401 (Reissue 1985). Evidence is probative if it tends in any degree to alter the probability of a material fact. *State v. Wells, supra*; *State v. Oliva*, 228 Neb. 185, 422 N.W.2d 53 (1988). If the evidence offered could show that a material fact is slightly more probable than it would appear without the evidence, it is relevant. *Id*. Section 27-401 requires only that the degree of probativeness be something more than nothing. *Id*.

The evidence has little, if any, probative value as to whether Stortz had motive to kill Danae Cook, her mother, and her brother. Moreover, even if the evidence were relevant and thus should have been admitted, its exclusion was harmless beyond a reasonable doubt. Harmless error exists in a jury trial of a criminal case when the court makes an erroneous evidential ruling which, on review of the entire record, did not materially influence the jury in a verdict adverse to the defendant. *State v. Cox*, 231 Neb. 495, 437 N.W.2d 134 (1989). Here, Hankins' confession, combined with the abundance of extrinsic evidence which corroborates it, overwhelmingly establishes Hankins' guilt, as is more fully developed in the analysis which follows in part II, 6.

### 4. Witness Records

Prior to trial, Hankins served a subpoena duces tecum for the records created when Dawn Cook was hospitalized at her own request for psychological problems approximately 4 months before the killings and about 8 months prior to trial. He wished to determine whether the records reflected on this witness' credibility. The trial judge ordered the records produced for an in camera review. The records reflect that although Dawn Cook denied hallucinating, she reported recent poor memory. The records also reveal a physician's statement that Dawn Cook's "memory for both recent and remote events appeared to show some blocking, however, not to a gross degree at this time." The trial judge concluded the records failed to show an impairment of Dawn Cook's ability to "perceive, remember, and relate events to a degree that could not

reasonably be revealed or tested by cross-examination," and denied Hankins access to the records.

Hankins argues the trial judge's decision denied him the ability to effectively cross-examine a chief prosecution witness. He urges that her testimony that Danae Cook was nervous around Hankins, that his relationship with her had deteriorated, that he had taken some money, and that his moods were swinging toward depression and anger provided evidence that he had a motive for the crimes, and he thus was entitled to cross-examine Dawn Cook about her own mental condition in order to properly impeach her.

A sharply divided U.S. Supreme Court in *Pennsylvania v. Ritchie*, 480 U.S. 39, 53, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987), concluded that the confrontation clause of U.S. Const. amend. VI does not empower a criminal defendant to require "pretrial disclosure of any and all information which might be useful in contradicting unfavorable testimony." We, however, recently ruled that the sixth amendment right to confront witnesses requires that upon a showing of reasonable grounds to believe that the failure to produce privileged impeaching information is likely to impair a criminal defendant's ability to effectively cross-examine the witness claiming the privilege, the witness' testimony must be excluded. *State v. Trammell*, 231 Neb. 137, 435 N.W.2d 197 (1989). While the *Ritchie* Court found no such sixth amendment right, it did hold that due process principles require the government to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. The U.S. Supreme Court ruled that in this context, evidence is material only if there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. Both *Ritchie* and *Trammell* provide for an in camera review of the information such as was held in the present case.

Under the circumstances, we cannot agree with the trial judge's determination that the information Hankins sought did not have a substantial bearing on Dawn Cook's credibility. The nature of the information was such that it should have been made available to him for such use as might be appropriate during his cross-examination of Dawn Cook. However, Dawn

Cook's testimony was not, contrary to Hankins' claim, crucial to the prosecution. Hankins' depression and shifts in his moods were established by his own confession, as well as by psychiatric evidence. The fact of his encounter with Barbara Cook over his failure to return the change from a $20 bill was also testified to by Haws. Dawn Cook's testimony was indeed, as the State claims, cumulative. Thus, it cannot be said there is a reasonable probability that had the information been disclosed, the result of the proceeding would have been different.

### 5. Claim of Mistrial Because of Cross-examination

The fifth summarized assignment of error, complaining of the denial of Hankins' first motion for mistrial, arises from the State's cross-examination of Kentsmith, one of the psychiatrists testifying on Hankins' behalf as detailed in part I above. Hankins complains that the State was permitted, over objection, to inquire whether Kentsmith had been aware that approximately a month prior to the subject killings, Hankins, after being unable to visit a hospitalized friend, damaged a vehicle by hitting it with a "winch bar." Hankins argues the question "served no useful cross-examination purpose" but, rather, was used to "put before the jury the fact that . . . Hankins had previously used the winch bar to strike and cause damage, and therefore he might use the winch bar to strike and cause the deaths of Danae Cook, Kevin Cook and Barbara Cook." Brief for appellant at 43.

We begin the analysis of the issues presented by this summarized assignment of error by recalling that a mistrial is generally granted upon the occurrence of a fundamental failure preventing a fair trial in the adversarial process. *State v. Pierce*, 231 Neb. 966, 439 N.W.2d 435 (1989); *State v. Sardeson*, 231 Neb. 586, 437 N.W.2d 473 (1989). A mistrial may be warranted where unfairness has been injected into a jury trial and so permeates the proceedings that no amount of admonition to the jury can remove the unfairness to a party and may result from the improper admission of prejudicial evidence. *State v. Jones, ante* p. 576, 441 N.W.2d 605 (1989); *State v. Pierce, supra.* The decision to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent

an abuse of discretion. *State v. Sardeson, supra*; *State v. Byrd*, 231 Neb. 231, 435 N.W.2d 898 (1989).

The record establishes that the information at issue was contained in a police report Kentsmith considered. Under Neb. Rev. Stat. § 27-705 (Reissue 1985), an expert can be required to disclose on cross-examination the facts or data underlying his or her opinion. See *Gordman Properties Co. v. Board of Equal.*, 225 Neb. 169, 403 N.W.2d 366 (1987). Thus, an expert may be cross-examined for the purposes of testing and inquiring into the basis for his or her opinion. Such examination is useful to the jury in assessing the probative value of the expert's opinion. As we have previously noted, cross-examination is proper as to anything tending to affect the accuracy, veracity, or credibility of a witness, and anything within the knowledge of a witness tending to rebut evidence given on direct examination is admissible as a matter of right on cross-examination. *State v. Sutton*, 231 Neb. 30, 434 N.W.2d 689 (1989). Moreover, the scope of cross-examination of a witness rests in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion. *State v. Sutton, supra*. The trial judge did not abuse his discretion either in permitting the cross-examination at issue or in denying a mistrial.

### 6. Sufficiency of Evidence and Motions for Directed Verdict or to Dismiss

The sixth summarized assignment of error rests on Hankins' motion for a directed verdict made at the close of the State's case and his motion to dismiss the charges against him made at the close of all the evidence, both of which motions the trial judge overruled. Hankins argues that the trial judge should have directed a verdict in his favor or granted his later first motion for new trial, as the evidence was insufficient to support the verdicts in that there was not sufficient evidence to corroborate his confession as required by *State v. Scott*, 200 Neb. 265, 263 N.W.2d 659 (1978).

In determining the sufficiency of the evidence to sustain a conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of the witnesses,

determine the plausibility of explanations, or weigh the evidence; such matters are for the finder of fact. The verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Butts,* ante p. 71, 439 N.W.2d 493 (1989); *State v. Lehl,* 231 Neb. 906, 438 N.W.2d 505 (1989).

On a defendant's motion to dismiss for insufficient evidence of the crime charged against the defendant, the State is entitled to have all its relevant evidence accepted as true, the benefit of every inference reasonably drawn from the evidence, and every controverted fact resolved in its favor. *State v. Pierce,* 231 Neb. 966, 439 N.W.2d 435 (1989). In a criminal case a court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged, or (2) the evidence is so doubtful in character and lacking in probative value that a finding of guilt based on such evidence cannot be sustained. *State v. Pierce, supra*; *State v. Diesing,* 231 Neb. 132, 435 N.W.2d 190 (1989).

A voluntary confession is insufficient, standing alone, to prove that a crime has been committed, but it is competent evidence of that fact and may, with slight corroborative circumstances, be sufficient to warrant a conviction. *State v. Scott, supra*; *State v. Moss,* 182 Neb. 502, 155 N.W.2d 435 (1968); *Sullivan v. State,* 58 Neb. 796, 79 N.W. 721 (1899). Where a crime involves physical damage to a person or property, the prosecution must generally show that the injury for which the accused confesses responsibility did in fact occur and that some person was criminally culpable. There need be no link, outside the confession, between the injury and the confessor. *State v. Scott, supra.*

Evidence certainly exists in this case sufficient for the jury to conclude that each of the three victims was killed and that some person was criminally culpable. Hankins' confession sufficiently linked him to the crimes, and, as noted earlier, a surfeit of evidence extrinsic to the confession exists which corroborates Hankins' guilt. Hankins had access to the apartment, and his was the only fingerprint discovered on the weapon used; he owned the metal bar on which Kevin Cook's blood and Danae Cook's hair were found. In addition,

Hankins' clothing and Danae Cook's automobile were missing from the apartment when the bodies were found. Further, as the State points out, the physical evidence coincided with Hankins' confession as to the time of death, the location and condition of the bodies, and the nature of the murder weapon. Hankins' admission that he woke up "depressed and thinking about a lot of things"; that he "got up, went into the dining room" and picked up his "winch bar, walked into the bedroom and started beating" Barbara Cook while she was sleeping; and that after he finished, he went "into the living room and started beating" Danae Cook and then Kevin Cook establishes the killings were done "purposely and with premeditated malice," as required for the offense of first degree murder under the provisions of § 28-303(1). Thus, sufficient evidence exists to support the jury's verdicts, and there is no basis on which the trial judge could properly sustain Hankins' motions to direct a verdict in his favor or to dismiss the charges.

## 7. Instructions Given

In this seventh summarized assignment of error, Hankins mounts two separate attacks on a total of 5 of the 32 instructions comprising the trial judge's charge to the jury. The first attack involves three instructions which deal with the alternative findings the jury could make. The second attack involves two instructions which Hankins claims both improperly put the burden of proving his insanity at the time of the offense upon him and improperly defined insanity.

### a. Alternative Findings

As to the first attack, Hankins takes exception not to the contents of the three instructions in question, but urges they were defective in that "not guilty" was placed last in the order of alternative findings the jury could make.

While not in the form of step instructions, see *State v. Patterson, ante* p. 304, 440 N.W.2d 242 (1989), the instructions in question listed the jury's options in the following order: (1) guilty of first degree murder, (2) guilty of second degree murder, (3) not responsible by reason of insanity, or (4) not guilty.

Hankins' claim, however, is without merit. If jury

instructions, when read together, correctly state the law, are not misleading, and adequately· cover the issues, there is no prejudicial error. *State v. Cole*, 231 Neb. 420, 436 N.W.2d 209 (1989); *State v. Kistenmacher*, 231 Neb. 318, 436 N.W.2d 168 (1989); *State v. Donhauser*, 231 Neb. 114, 435 N.W.2d 189 (1989). Furthermore, the wording of jury instructions is within the trial court's discretion. *State v. Donhauser, supra.* Having instructed the jury that Hankins was presumed innocent, the order of the alternative findings is not misleading and of no import in this case, as the instructions read together properly state the law.

### b. *Insanity*

This brings us to the remaining two questioned instructions, which define insanity and allocate the burden of proving it upon Hankins. The matter of the burden of proof is related to, and resolved by, the analysis of Hankins' claim that § 29-2203, which allocates the burden as do the instructions at issue, is unconstitutional. Thus, we defer consideration of the correctness of the questioned instructions in this regard until part II, 10, of this opinion, which concerns itself with the constitutionality of the challenged statutory language.

Thus, we reach the matter of defining legal insanity. Hankins recognizes that the instructions define the term in accordance with existing Nebraska law but argues that the law as it exists should be abandoned, as it is "archaic and not reflective of the current state of psychiatry."

Our formulation of the test for legal insanity was conceived in *M'Naghten's Case*, 8 Eng. Rep. 718 (1843), which considered an accused sane at the time of the offense if he or she then had the capacity to understand the nature of the act committed and was able to distinguish right from wrong with respect to such act. *State v. Carr*, 231 Neb. 127, 435 N.W.2d 194 (1989); *State v. Robertson*, 223 Neb. 825, 394 N.W.2d 635 (1986). Hankins urges that the better test is found in the American Law Institute's Model Penal Code § 4.01 (1962). That section of the code provides that one is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, he or she lacks substantial capacity either to appreciate

the criminality of the conduct or to conform his or her conduct to the requirement of law. As used in the code, the phrase "mental disease or defect" excludes an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

Noting that in *Leland v. Oregon*, 343 U.S. 790, 72 S. Ct. 1002, 96 L. Ed. 1302 (1952), *reh'g denied* 344 U.S. 848, 73 S. Ct. 4, 97 L. Ed. 659, the U.S. Supreme Court held that the states may, without violating the 14th amendment, use the *M'Naghten* rule to determine criminal responsibility, we, in *State v. Jacobs*, 190 Neb. 4, 205 N.W.2d 662 (1973), *cert. denied* 414 U.S. 860, 94 S. Ct. 75, 38 L. Ed. 2d 111, declined a similar invitation to abandon our current definition. We are not persuaded that, contrary to Hankins' claim, the interests of society would be better served by the code's description of the mental conditions which should excuse criminal conduct than by the excuse provided by our present rule. We therefore again decline the invitation to change our well-settled law in this regard.

## 8. Instruction Refused

The eighth summarized assignment of error deals with the trial judge's refusal to give Hankins' requested instruction concerning his disposition should he be found not responsible by reason of insanity. However, this claim overlooks that the trial judge did instruct the jury not to consider Hankins' punishment or the nature of his treatment in rendering its verdict. Additionally, we held that under § 29-2203 as it existed before its amendment in 1984, it was not error for the trial court to refuse to instruct the jury of the consequences of a verdict of not guilty by reason of insanity, as the dispositional effects of a verdict in a criminal case are immaterial to a jury's deliberations. *State v. Williams*, 217 Neb. 539, 352 N.W.2d 538 (1984); *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984), *cert. denied* 469 U.S. 1028, 105 S. Ct. 447, 83 L. Ed. 2d 372. The same holds true with respect to the consequence of a verdict of not responsible by reason of insanity under the present provisions of § 29-2203.

## 9. Closing Argument

In connection with the ninth summarized assignment of

error, Hankins argues that because he was assigned the burden of proof on the issue of insanity, the trial judge erroneously denied him surrebuttal in closing argument.

Under the Code of Criminal Procedure, specifically Neb. Rev. Stat. § 29-2016(6) (Reissue 1985), the appropriate procedure for closing arguments in criminal cases is that "when the evidence is concluded, unless the case is submitted without argument, the counsel for the state shall commence, the defendant or his counsel follow, and the counsel for the state conclude the argument to the jury."

Nonetheless, Hankins cites *Rea v. Bishop*, 41 Neb. 202, 59 N.W. 555 (1894), a civil case in which we upheld the trial court's decision to allow the defendant to open and close argument because he had admitted the plaintiff's pleadings that a contract existed between them, and the only issue left was his affirmative defense of insanity at the conception of the contract. *Bishop* is based on the predecessor to Neb. Rev. Stat. § 25-1107 (Reissue 1985), which governs the order of trial in a civil case and differs from § 29-2016(6). Section 25-1107(6) provides in part: "In argument, the party required first to produce his evidence shall have the opening and conclusion." Subsection (3) provides: "The party who would be defeated if no evidence were given on either side must first produce his evidence; the adverse party will then produce his evidence."

There exists other civil case law based on § 25-1107 or its predecessor, which holds that as a general rule, the party with the burden of proof is entitled to open and close argument. *Rath v. Sanitary District No. One*, 156 Neb. 444, 56 N.W.2d 741 (1953); *Zweibel v. Myers*, 69 Neb. 294, 95 N.W. 597 (1903). In other words, the party required first to produce evidence, i.e., the party against whom judgment would be rendered if no evidence were introduced by either party, has the right to open and close argument. *Rea v. Bishop, supra*. Where there are several parties who have the burden of proof, the trial court has discretion to determine which litigant shall open and close. *In re Estate of O'Connor*, 117 Neb. 636, 222 N.W. 57 (1928).

This, however, is a criminal case, and the criminal procedure governs. It must be remembered that the State retained the burden to prove the elements of first degree murder, or of the

lesser offense of second degree murder, beyond a reasonable doubt. Only if the State met its burden of proving every element of the crimes charged did Hankins' burden arise. Thus, the trial judge properly denied surrebuttal.

### 10. Constitutionality of § 29-2203

In the 10th summarized assignment of error, Hankins asserts that the portion of § 29-2203 which provides that one prosecuted for an offense "may plead that he or she is not responsible by reason of insanity at the time of the offense and in such case the burden shall be upon the defendant to prove the defense of not responsible by reason of insanity by a preponderance of the evidence" violates a variety of federal and state constitutional provisions. His argument, however, is limited to urging that placing the burden of proving insanity at the time of the offense on a criminal defendant deprives such defendant of due process.

So far as the federal Constitution is concerned, the issue has been resolved adversely to Hankins' position. In *Patterson v. New York*, 432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977), the U.S. Supreme Court, relying on *Leland v. Oregon*, 343 U.S. 790, 72 S. Ct. 1002, 96 L. Ed. 1302 (1952), *reh'g denied* 344 U.S. 848, 73 S. Ct. 4, 97 L. Ed. 659, held that once the facts constituting a crime are established beyond a reasonable doubt based on all the evidence, including the evidence of the defendant's mental state, a state may, by statute, require the defendant to prove as an affirmative defense his or her insanity at the time of the offense. Such procedure does not violate the due process clause of the 14th amendment. Nor do we find anything in Nebraska's due process clause, Neb. Const. art. I, § 3, which requires a different result.

Thus, the trial judge correctly instructed the jury:

> While the burden of proving each and every material element of the crime charged, by evidence beyond a reasonable doubt, is upon the State and that burden never shifts, insanity is an affirmative defense to a crime and the burden is upon the Defendant to prove insanity by a preponderance of the evidence.

That determination also resolves adversely to Hankins his

claim in part II, 7b, above, that the instructions placing on him the burden of proving his insanity were erroneous.

### 11. Claimed Withholding of Information

This 11th and final summarized assignment of error arises from the Douglas County attorney's posttrial interview with an Omaha radio station, wherein he stated: "[O]bviously we had some evidence that we held back even from the media and waited and used it in that trial and I think we used it very effectively . . . ." That declaration prompted Hankins to move for a mistrial or, for the second time, a new trial.

Hankins argues that the Douglas County attorney's statement that the prosecution withheld information *even* from the media indicates that information and material contemplated by the order for mutual and reciprocal discovery was withheld from him. Indeed, Hankins' attorney testified at the hearing held on his motion that three documents had been withheld from him: the records concerning Hankins' incarceration before trial relied upon by one of the State's psychiatrists, the charts of various injuries suffered by the three victims, and a fingerprint report indicating that five unidentified fingerprints were found at the crime scene and one on Hankins' automobile. Notwithstanding his interview statement, the Douglas County attorney testified that his office withheld no information from the defense, and the State adduced other evidence that the documents Hankins' attorney said were not supplied to him had in fact been provided to the defense.

The granting or refusal of a motion for new trial, like the granting or refusal of a mistrial, is left to the discretion of the trial court, and in the absence of an abuse of that discretion, the determination will not be disturbed on appeal. *State v. Andersen, ante* p. 187, 440 N.W.2d 203 (1989). There being evidence to support the trial judge's ruling, it cannot be said he abused his discretion in refusing to grant a new trial or declare a mistrial because of the prosecution's claimed failure to disclose material evidence.

### III. DECISION

Since the record sustains none of Hankins' summarized

assignments of error, the judgment below is affirmed.

AFFIRMED.

FAHRNBRUCH, J., concurs in the result.