STATE OF NEBRASKA, APPELLEE, V. LIONEL R. BROWN, APPELLANT.

455 N.W.2d 547

Filed May 18, 1990.    No. 89-653.

Lee A. Larsen, Assistant Sarpy County Public Defender, for appellant.

Robert M. Spire, Attorney General, and Donald A. Kohtz for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Defendant, Lionel R. Brown, appeals his convictions pursuant to verdicts for first degree sexual assault in violation of Neb. Rev. Stat. § 28-319 (Reissue 1989), first degree false imprisonment in violation of Neb. Rev. Stat. § 28-314 (Reissue 1989), and first degree assault in violation of Neb. Rev. Stat. § 28-308 (Reissue 1989). Following an enhancement hearing, the district court found Brown to be a habitual criminal under Neb. Rev. Stat. § 29-2221 (Reissue 1989) and therefore determined that he was subject to sentences of not less than 10 nor more than 60 years' imprisonment on each conviction. The district court thereafter sentenced Brown to concurrent terms of imprisonment for not less than 20 nor more than 50 years each on the first degree sexual assault and first degree false imprisonment convictions and to imprisonment for not less than 10 nor more than 30 years on the first degree assault conviction, such sentence to run consecutively to the other two sentences. Brown's operative assignments of error assert the district court erred by (1) refusing to grant his motion to dismiss the charges against him at the close of the State's case in chief and (2) failing to instruct the jury on the issue of self-defense pursuant to Neb. Rev. Stat. § 28-1409 (Reissue 1989). We affirm.

The record as established by the State's case in chief reveals that Brown was acquainted with the victim prior to his commission of the crimes which resulted in his convictions. The victim had cut Brown's hair at the school where she was training to become a beautician, and she had given Brown her telephone number when they again met at a party. Brown later

occasionally provided the victim transportation to such places as a grocery store, a government office, and the victim's place of employment. The victim paid Brown small amounts of money to reimburse him for expenses, e.g., the cost of gasoline associated with such transportation. The victim testified that she did not have a romantic relationship with Brown.

At approximately 7:30 p.m. on December 13, 1988, Brown drove the victim to a bar in Council Bluffs, Iowa, where the victim worked as a go-go dancer. Later that evening, after the victim had worked for about $1\frac{1}{2}$ hours, Brown agreed to give her a ride home. After Brown and the victim left the bar, the victim realized that Brown was not driving in the direction of her home and told him that "he was going the wrong way." Brown then indicated that he "wanted to go by his house and get something." The victim told Brown that she was tired and wanted to go home and to get her daughter from her mother's, and asked Brown to take her home first. Brown responded by telling the victim to "shut up and be quiet." Brown then proceeded to his Bellevue, Nebraska, apartment building.

After arriving at his apartment, Brown "snatched open" the passenger door of his automobile, "kind of grabbed" the victim by the neck and clothing, and "snatched [her] up out of the car." The victim then attempted to push Brown away, stating: " 'Lionel, no, I don't want to go in. I'll sit in the car.' " Brown nevertheless proceeded to take the victim into his apartment. The victim testified that once inside the apartment, she was "screaming, trying to get away, and [Brown] was letting [her] know that [she] wasn't going anywhere and that [she] might as well just . . . take off [her] clothes and have sex with him" so that he could then take her to see her daughter.

The victim testified that Brown removed her clothing and instructed her to remove his pants, telling her to " '[t]ake them off or else.' " The victim complied with Brown's command, and Brown then forced the victim into his bedroom, where he instructed the victim to perform fellatio on him. The victim testified that she obeyed this command "[b]ecause [she] was scared." Brown then told the victim "to sit on top of him," and, against the will of the victim, the two engaged in sexual intercourse.

Thereafter, Brown told the victim that he was going to take her to Florida, and directed her to help pack some luggage. The victim then asked Brown to take her home so that she could be with her daughter, and asked Brown to let her leave his apartment. Regarding Brown's response to her request, the victim testified:

> He was just, you know, he would just say, "Shut up, you're not going nowhere." He said he was going to kill me, either he was going to kill me here or he'd wait until I get to Florida or he'll kill me there, that I'll never see my daughter again.

The victim testified that she later attempted to use the telephone but was unable to get a dial tone before Brown "snatched" the telephone away from her and told her that it was "out of order." The victim also tried to run out of the apartment, but Brown caught her "in the kitchen," and at that point he struck her head and back and began choking her on the kitchen floor. The victim then attempted to strike Brown with an object she had grabbed from the top of his stove but lost the object after struggling with Brown. Brown also kicked the victim and struck her in the eye.

While in Brown's apartment, the victim screamed for help and pounded on the walls to attract attention. Brown responded by telling the victim that no one could hear her so she "might as well just shut up and be calm." The victim testified that at one point she threw an object through a window of the apartment in order to attract attention; this prompted Brown to use his fist to strike the victim's face.

Frederick John Trofholz II, a neighbor who lived in Brown's apartment building, noticed the commotion which was coming from Brown's apartment and testified that he heard a woman scream " '[h]elp me' " and " '[s]ave me.' " Trofholz also testified: "At a couple points she said things to the effect of 'Dear God, Jesus, save me.' " Brandon Eric Terrell, another neighbor who lived in Brown's apartment building, also noticed the commotion and testified that he heard a woman screaming " 'Help me. Somebody please help me.' "

Trofholz eventually dialed 911 to summon police to the apartment building. When Bellevue Police Officer Thomas

Piernicky arrived, he also heard a woman screaming for help. Piernicky knocked on Brown's apartment door, and Brown eventually cracked the door open 2 to 3 inches. Crying and bleeding from the nose, the victim ran up behind Brown and said that she needed help because Brown was going to kill her. Piernicky then wedged his flashlight in the doorway while Brown attempted to close the door. When the victim again screamed for help, Piernicky observed Brown "[backhand the victim] with his fist and hit her in the eye." Piernicky then informed Brown that he was under arrest.

Shortly after Piernicky had arrived at Brown's apartment, Bellevue Police Sgt. Herbert Evers also arrived at the scene. Because of Brown's resistance, Piernicky and Evers had to wrestle Brown to the floor in order to place handcuffs on him. After Piernicky and Evers had wrestled Brown to the floor, the victim ran up and kicked Brown in the groin, and despite the officers' efforts to keep her away from Brown, the victim twice struck Brown in the eye before the police also arrested her for assaulting Brown. The victim was then taken to the hospital to be treated for her injuries.

Dr. Richard Greenberg, a board-certified ophthalmologist who examined the victim's eye injuries, testified that while the victim has 20/20 vision in her right eye, the vision in the left eye is permanently distorted and blurred as a result of scarring underneath the retina. Greenberg testified that such scarring is consistent with an injury caused by a hard blow from a fist. The victim testified that she had "normal" vision in her left eye before being struck by Brown.

While the foregoing represents the evidence presented by the State's case in chief, Brown's testimony describes a different scenario. According to Brown, the victim voluntarily went to his apartment to have sex with him, he used no force, and she was free to leave at any time. Brown testified that he and the victim had engaged in consensual sex and that the two later "got into a deep discussion which turned into an argument" concerning the victim's desire to get some cocaine. Brown further testified that when he refused to get cocaine, the victim became angry and started "yelling" and "screaming," so he started "yelling back at her."

According to Brown, the victim threw a candleholder through a window, breaking the window glass, and Brown then grabbed the victim and tried to prevent her from doing further damage. On direct examination by his trial attorney, Brown provided the following testimony regarding his altercation with the victim:

Q. Did you strike her at some time that night?
A. Yeah, with my elbow.
Q. Had she hit you previously to that?
A. Yes, sir.

. . . .

Q. Why did you physically scuffle?
A. Because I wouldn't get her the.....
Q. Did she strike you first?
A. Yes, she did.
Q. Were you defending yourself and your property?
A. In a way, yes, sir.
Q. Did the police eventually come?
A. Yes, sir.

. . . .

Q. . . . Were you visible to the police?
A. Yes, sir.
Q. Was the back of your head visible to the police?
A. No, sir.
Q. What, if anything, happened when the police were at the front door?
A. I was hit in the head by a picture plaque.

. . . .

Q. Oh, and who hit you in the head?
A. [The victim] did.

. . . .

Q. You got hit in the back of the head?
A. Yes, sir.
Q. Okay. What did you do then?
A. I automatically sent my hand going backward, you know, from where the pain came from.
Q. Did you strike her then?
A. Yes, sir.

During cross-examination, Brown testified that he struck the

victim twice, once with his elbow when they were "scuffling" on the floor after the victim had broken a window and again when the victim struck him in the back of the head after the police arrived. In addition, Brown provided the following testimony:

Q. It's your testimony today that you were just defending yourself and your property there in the apartment that night; is that correct?

A. I did say that we did have sex, but as far as —

Q. As far as the violence?

A. Right.

Q. You're just defending yourself and defending your apartment; right?

A. The notion of getting cocaine.

Q. I'm sorry?

A. The notion of her getting cocaine.

Q. The notion of her getting cocaine. What's that mean?

A. That is what I was defending. I wasn't about to go out and subject myself to, you know, at that time of night anyway, as far as, you know.

While the record indicates that Brown's trial attorney failed to object to the proposed jury instructions, he apparently did request a self-defense instruction. During the hearing on the motion for a new trial, the State's attorney noted that at a sidebar conference, which for some unexplained reason appears not to have been reported, Brown's trial attorney had requested a self-defense instruction, and the district court judge had denied that request. During the hearing, the judge stated: "Well, it's my duty to instruct in the law that's applicable, but I determined that self-defense wasn't applicable. So I suppose that that's—I think maybe he preserved that error." Later during the hearing, when Brown's counsel (a different attorney from the one representing Brown at trial) suggested that Brown's trial attorney had tendered the requested self-defense instruction, the district court responded:

No, I can indicate to you there was never a self-defense instruction tendered, never. Okay? I think [the State's attorney is] absolutely right, I think [Brown's trial

attorney] requested a self-defense instruction and he may have requested it even in the instructional conference in chambers. I don't know. But I think [the State's attorney is] absolutely right. I do think he requested it at the sidebar conference.

But so the record's absolutely clear and preserves Mr. Brown's rights, doesn't make any difference when the request is made or even if it was tendered - I don't think it was tendered - I deny it. I just don't think the evidence supported a self-defense instruction, period. So if I'm wrong on that, that's something that he can come back and get a new trial on if the Supreme Court says so.

Brown first alleges that the district court erred in refusing to grant his motion to dismiss the charges against him at the close of the State's case in chief. On a criminal defendant's motion to dismiss for insufficient evidence of the crime charged against the defendant, the State is entitled to have all its relevant evidence accepted as true, the benefit of every inference reasonably drawn from the evidence, and every controverted fact resolved in its favor. *State v. Boppre,* 234 Neb. 922, 453 N.W.2d 406 (1990); *State v. Hankins,* 232 Neb. 608, 441 N.W.2d 854 (1989); *State v. Pierce,* 231 Neb. 966, 439 N.W.2d 435 (1989). In a criminal case a court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged, or (2) the evidence is so doubtful in character and lacking in probative value that a finding of guilt based on such evidence cannot be sustained. *State v. Boppre, supra*; *State v. Hankins, supra*; *State v. Diesing*, 231 Neb. 132, 435 N.W.2d 190 (1989).

While Brown's brief only addresses the sufficiency of the State's evidence with respect to the charge of first degree sexual assault, Brown's contention clearly fails with respect to each charge for which he was convicted. A review of the facts presented earlier makes it obvious that the State presented ample evidence to support a conviction on each of the charges against Brown. The jury could reasonably find that Brown overcame the victim by force and sexually penetrated her in violation of the provisions of § 28-319. The jury could also reasonably find that Brown knowingly restrained or abducted

the victim under terrorizing circumstances or under circumstances which exposed her to the risk of serious bodily injury in violation of § 28-314. There was also evidence on the basis of which the jury could reasonably find that Brown intentionally or knowingly caused the victim serious bodily injury in violation of § 28-308.

Brown next alleges that the district court erred in failing to instruct the jury on the issue of self-defense pursuant to § 28-1409.

The State contends that Brown is precluded from raising this issue on appeal because his trial attorney failed to object to the instructions which were given. However, it is the duty of a trial court, without any request to do so, to instruct the jury on issues raised by the pleadings and supported by the evidence. *State v. Lenz*, 227 Neb. 692, 419 N.W.2d 670 (1988). Furthermore, a defendant is entitled to have the jury instructed on his or her theory of defense if there is any evidence to support it. *State v. Graham*, 234 Neb. 275, 450 N.W.2d 673 (1990). Nonetheless, a trial court is not required to give an instruction where there is insufficient evidence to prove the facts claimed. *State v. Marco*, 230 Neb. 355, 432 N.W.2d 1 (1988).

Self-defense is codified in § 28-1409 as follows:

(1) Subject to the provisions of this section and of section 28-1414, the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

As stated in *State v. Graham, supra* at 278-79, 450 N.W.2d at 676:

In order for the self-defense justification to be applicable, (1) the belief that force is necessary must be reasonable and in good faith, *State v. Cowan*, 204 Neb. 708, 285 N.W.2d 113 (1979); (2) the force must be immediately necessary, *State v. Schroeder*, 199 Neb. 822, 261 N.W.2d 759 (1978); and (3) the force used must be justified under the circumstances, *State v. Drew*, 216 Neb. 685, 344 N.W.2d 923 (1984). See, also, NJI 14.33.

Under the evidence in this case, self-defense is not applicable to the charge of first degree sexual assault, nor can we imagine a situation in which forcibly subjecting one to sexual penetration could be described as being immediately necessary for the purpose of protecting oneself against the use of unlawful force by the person so subjected. Moreover, whether self-defense can ever apply to a charge of first degree false imprisonment, it is clear that there is no evidence which makes it applicable to that charge in this case. By claiming that he never held the victim against her will and that she was free to leave at any time, Brown merely denies that he ever imprisoned the victim; such evidence provides no basis for a self-defense instruction. The situation would seem to be otherwise, however, with respect to the first degree assault charge. In that connection there was evidence that before the police arrived, the victim struck Brown in the course of an argument and that it was not until she first struck Brown that he, in an effort to defend himself, struck the victim. Brown further testified that he opened the door when the police arrived and that the victim then struck him in the back of the head with a picture plaque. Brown then, in his words, "automatically sent [his] hand going backward . . . from where the pain came from." While Brown was not entitled to merely launch a retaliatory strike against the victim, he, under § 28-1409, was entitled to use force to protect himself from the victim if the force employed by the victim was unlawful.

Because Brown was entitled to have the jury instructed on his theory of defense if there was any evidence to support it, and because Brown's testimony does represent evidence that he acted in self-defense when he reacted after allegedly being struck by the victim, a self-defense instruction should have been given. However, it must be remembered that in addition to finding Brown guilty of first degree sexual assault and first degree assault, the jury also found him guilty of first degree false imprisonment. In finding Brown guilty of first degree false imprisonment, the jury necessarily found that Brown restrained or abducted the victim. Implicit in that determination is the jury's disbelief in Brown's testimony that the victim was free to leave at any time. Consequently, the jury's verdict compels a conclusion that the victim was being held

against her will and that her use of force was itself lawful action taken in her own self-defense against the unlawful force employed by Brown to falsely imprison her. See § 28-1409. Because the jury's verdict respecting Brown's false imprisonment charge compels a conclusion that the victim's use of force was lawful, and because § 28-1409 only allows a person to use force to protect himself from unlawful force, the jury could not have concluded that Brown was acting in self-defense when he struck the victim. Consequently, Brown was not prejudiced by the district court's failure to instruct the jury on the self-defense issue. Error cannot be predicated upon the failure to give jury instructions absent prejudice to the rights of the defendant. *State v. Evans*, 215 Neb. 433, 338 N.W.2d 788 (1983). An error made by a trial court in instructing the jury is not prejudicial where the jury's factual findings negate the consequence of such error. See, *U.S. v. Klecan*, 859 F.2d 570 (8th Cir. 1988); *State v. Grimes*, 90 S.D. 43, 237 N.W.2d 900 (1976).

The record sustaining neither of Brown's operative assignments of error, the judgment of the district court is affirmed.

AFFIRMED.