Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/02/2016 09:10 AM CST

State of Nebraska, appellee, v. Rosario
Betancourt-Garcia, appellant.
___ N.W.2d ___

Filed December 2, 2016.    No. S-15-1001.

1. **Appeal and Error.** An appellate court does not consider errors which are argued but not assigned.

2. **Judgments: Pleadings: Plea in Abatement: Appeal and Error.** Regarding questions of law presented by a motion to quash or plea in abatement, an appellate court is obligated to reach a conclusion independent of the determinations reached by the trial court.

3. **Convictions: Evidence: Appeal and Error.** Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

4. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.

5. **Courts: Appeal and Error.** Appellate review is limited to those errors specifically assigned as error in an appeal to a higher appellate court.

6. **Criminal Law: Limitations of Actions: Indictments and Informations.** It is generally sufficient in an information to describe the crime charged in the language of the statute and it is not ordinarily necessary to negative the exceptions contained in a statute defining a crime if they are not descriptive of the offense. The statute of limitations is not descriptive of the offense, and it is not necessary to plead an exception which makes it inoperative.

7. **Criminal Law: Limitations of Actions: Pleadings: Pleas.** Statutes of limitations, as applied to criminal procedure, need not be pleaded and may be raised under the general plea of not guilty.

8. **Criminal Law: Indictments and Informations: Proof.** The State, within the information, has the burden to set forth all of the elements of the crime charged.

9. **Criminal Law: Limitations of Actions: Words and Phrases.** For the purposes of Neb. Rev. Stat. § 29-110(1) (Reissue 1995), the phrase "fleeing from justice" means leaving one's usual abode or leaving the jurisdiction where an offense has been committed, with intent to avoid detection, prosecution, or punishment for some public offense.

10. **Convictions: Evidence: Appeal and Error.** An appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction.

11. **Criminal Law: Directed Verdict.** In a criminal case, the court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged or (2) evidence is so doubtful in character and lacking in probative value that a finding of guilt based on such evidence cannot be sustained.

12. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

13. **Effectiveness of Counsel: Proof: Appeal and Error.** An appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel when raising an ineffective assistance claim on direct appeal.

14. ____: ____: ____. To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. An appellate court may address the two prongs of this test, deficient performance and prejudice, in either order.

15. **Effectiveness of Counsel: Proof.** To show prejudice on a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

16. **Effectiveness of Counsel: Speedy Trial: Appeal and Error.** When a defendant alleges he or she was prejudiced by trial counsel's failure to

properly assert the defendant's speedy trial rights on appeal, the court must consider the merits of the defendant's speedy trial rights under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

17. **Effectiveness of Counsel: Speedy Trial.** Only if a motion for discharge on speedy trial grounds should have resulted in the defendant's absolute discharge, thus barring a subsequent trial and conviction, could a failure by counsel to make the motion for discharge be deemed prejudicial.

18. **Speedy Trial.** Nebraska's speedy trial statutes require that those who are charged with crimes be brought to trial within 6 months, as calculated by the applicable statute. To calculate the deadline for trial under the speedy trial statutes, a court must exclude the day the State filed the information, count forward 6 months, back up 1 day, and then add any time excluded under Neb. Rev. Stat. § 29-1207(4) (Cum. Supp. 2014).

19. ____. If the State does not bring the defendant to trial within the permissible time, the court must order an absolute discharge from the offense charged.

20. **Speedy Trial: Indictments and Informations.** For a felony, the speedy trial clock begins to run on the date that the indictment is returned or the information is filed, not on the date on which the complaint is filed.

21. **Constitutional Law: Speedy Trial.** Determining whether a defendant's constitutional right to a speedy trial has been violated requires a balancing test in which the courts must approach each case on an ad hoc basis. This balancing test involves four factors: (1) length of delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant. None of these four factors standing alone is a necessary or sufficient condition to the finding of a deprivation of the right to speedy trial. Rather, the factors are related and must be considered together with other circumstances as may be relevant.

22. ____: ____. In analyzing the prejudice factor of the four-factor test to determine whether constitutional speedy trial rights have been violated, the U.S. Supreme Court enumerated three aspects: (1) preventing oppressive pretrial incarceration, (2) minimizing anxiety and concern of the defendant, and (3) limiting the possibility that the defense will be impaired by dimming memories and loss of exculpatory evidence.

23. **Constitutional Law: Speedy Trial: Presumptions.** Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance when determining whether constitutional speedy trial rights have been violated.

24. **Constitutional Law: Speedy Trial.** A showing of actual prejudice to a defendant alleging violation of constitutional speedy trial rights is

required if the government exercised reasonable diligence in pursuing the defendant.

25. **Kidnapping: Sentences.** The provisions of Neb. Rev. Stat. § 28-313(3) (Reissue 1995) are mitigating circumstances which may reduce the penalty for kidnapping and are therefore a matter for the court at sentencing, not the jury.

26. **Kidnapping.** Rescue is not a voluntary release of a kidnapping victim.

27. **Appeal and Error: Words and Phrases.** Plain error exists where there is error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.

28. **Constitutional Law: Criminal Law: Pleas.** The considerations involved in determining whether one freely, intelligently, voluntarily, and understandingly pleads guilty have no application where a criminal defendant pleads not guilty, for in such a circumstance, the defendant does not surrender the constitutional rights inherent in a trial.

Appeal from the District Court for Madison County: MARK A. JOHNSON, Judge. Affirmed in part, and in part vacated and remanded for resentencing.

Mark D. Albin for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

HEAVICAN, C.J., WRIGHT, MILLER-LERMAN, CASSEL, STACY, KELCH, and FUNKE, JJ.

KELCH, J.

## I. INTRODUCTION

Following a jury trial, Rosario Betancourt-Garcia (Betancourt) appeals his convictions and sentences for kidnapping, use of a firearm to commit kidnapping, and conspiracy to commit kidnapping. On appeal, Betancourt alleges that the district court for Madison County erred in overruling his motion to quash, in overruling his motion for directed verdict, and in sentencing him for kidnapping. Further, Betancourt contends

that he received ineffective assistance of counsel. We reject Betancourt's claims, but we find plain error in the sentencing for the conspiracy conviction. Therefore, we affirm in part and in part vacate and remand for resentencing.

## II. FACTS

On November 15, 2003, officers of the Madison Police Department responded to a call and found a young man who had been bound and gagged. After the young man related that Betancourt had kidnapped him, the Madison Police Department conducted an immediate search for Betancourt, but did not find him.

On November 17, 2003, the Madison County Court issued warrants for the arrest of Betancourt and another suspect. That day, the State filed an information in county court, charging Betancourt with kidnapping and use of a deadly weapon to commit a felony.

On May 7, 2004, Texas authorities arrested Betancourt in Plano, Texas, based on the Nebraska warrant. On May 11, Betancourt signed a waiver of extradition proceedings.

On May 17, 2004, the Madison County sheriff's office dispatched transport personnel to Texas to extradite Betancourt back to Nebraska. At that time, the Madison County sheriff's office withdrew the warrant from a national notification system which was termed at trial the "teletype system" and placed a "hold" on Betancourt in Texas, but the warrant itself remained active. That day, Texas authorities mistakenly transferred Betancourt to the custody of the "immigration services," and subsequently, he was deported to Mexico.

On May 17, 2004, the Madison County sheriff's office directed its transport personnel, then en route to Texas, to return to Nebraska. On May 25, the Madison County sheriff's office reentered Betancourt's still-active warrant on the teletype system.

On July 1, 2013, nearly a decade later, Betancourt was arrested once more in Texas, based on the Nebraska warrant, and extradited to Nebraska.

The case was bound over to district court, and on August 21, 2013, the State filed an information charging Betancourt with kidnapping and use of a deadly weapon to commit a felony. Betancourt pled not guilty, and on November 14, he filed a motion for absolute discharge on speedy trial grounds. After hearing the foregoing evidence surrounding the events leading up to Betancourt's ultimate arrest and extradition to Nebraska, the district court overruled the motion. Betancourt's counsel appealed on his behalf, but then subsequently moved to dismiss that appeal, which motion the Nebraska Court of Appeals granted.

On May 21, 2014, the State filed an amended information. It again charged Betancourt with kidnapping (count I) and use of a deadly weapon to commit a felony (count II) and added a third charge, conspiracy to commit kidnapping (count III).

In response to the amended information, Betancourt filed a motion to quash count III as barred by the statute of limitations. His motion to quash stated:

> 1. That the State filed an Amended Information charging [Betancourt] in Count III with Conspiracy to Commit Kidnapping on May 21st, 2014;
>
> 2. That the State has not previously filed any information charging [Betancourt] with Conspiracy to Commit Kidnapping;
>
> 3. That the alleged events are to have occurred on November 15th, 2003, and
>
> 4. That the time for filing an Information for Conspiracy to Commit Kidnapping has lapsed.

The district court conducted a hearing, wherein it again heard the evidence recounted above regarding the events preceding Betancourt's ultimate arrest and extradition to Nebraska. The district court overruled Betancourt's motion to quash.

Betancourt later pled not guilty to all three charges.

At trial, the jury heard evidence that on November 15, 2003, officers with the Madison Police Department responded to a report of a man who had been found bound and gagged. When

officers arrived, they discovered a young Hispanic man on the front porch of a residence, with duct tape tightly wrapped around his face, ankles, and wrists, along with a "shoestring type cord" around his ankles and wrists, the latter of which were bound behind his back. The man was later identified as Pedro Jesus Rayon-Piza (Pedro). Pedro appeared "terrified" and, once freed, explained through a translator that he had been kidnapped at gunpoint by two people, one of whom he identified as his uncle, Betancourt.

Pedro testified that on November 15, 2003, Leonel Torres-Garcia (Torres) came to the house Pedro shared with his brother Jose Rayon-Piza (Jose) and asked for help with his car, which Torres said was stranded several miles away. Pedro stated that Torres requested Jose's help, but because Jose was unavailable, Pedro offered to help.

Pedro testified that he left with Torres in Pedro's car and drove several miles to Torres' car. According to Pedro, when he exited his car to help "jump-start" Torres' car, Betancourt appeared with a gun, put the gun to Pedro's head, and threatened to kill him. Pedro testified that Torres also produced a gun and pointed it at his head. Pedro stated that the men bound and gagged him and that Betancourt repeatedly asked him about the whereabouts of Betancourt's wife, from whom Betancourt was separated. Betancourt told Pedro that he believed Jose was "going out" with Betancourt's wife.

Pedro testified that Betancourt and Torres put him in a car and drove him to Betancourt's house. According to Pedro, Betancourt continued to threaten him with a gun and told him that Betancourt and Torres would put Pedro in a bag with stones and throw him in a river. When they arrived, the men put Pedro in a shed behind the house. Pedro testified that Betancourt told him that he was going to leave Pedro there, bring Jose to the same location, and then kill them both. Betancourt and Torres then left.

Pedro testified that Betancourt and Torres had not injured him. He testified that the doorway to the shed was open and

that he was not tethered to anything inside the shed. Pedro, still bound, managed to stand and jumped to the nearest house, where officers found him.

Torres testified that he and Betancourt had kidnapped Pedro. He generally minimized his involvement and denied participating in any plan. Torres admitted that he and Betancourt threatened Pedro with guns, took him to the shed, and left him there while they sought out Jose. Torres stated that Betancourt spoke to Jose on the telephone that evening.

Torres testified that when they could not find Jose, they returned to the area of the shed but saw officers everywhere. Torres testified that when Betancourt realized that Pedro had likely escaped, he appeared furious. Eventually, Betancourt and Torres decided to flee and drove all night to Houston, Texas. According to Torres, they threw the guns out of the car along the highway.

Jose testified similarly to his brother Pedro concerning the events preceding the abduction. He stated that sometime after Pedro departed with Torres, Jose went out looking for Pedro, but could not find him. Jose testified that after he returned from his search, Betancourt called him, threatened to "gut [him] like a deer," and made several more threatening calls throughout the night. Jose testified that Betancourt was angry because he believed Jose was in a relationship with Betancourt's wife and had accused Jose of having such a relationship sometime before Betancourt's wife had left Betancourt.

Betancourt's wife testified that a few months before she left Betancourt, Betancourt had accused Jose of having a relationship with her.

After Betancourt's wife testified, the State rested. Subsequently, Betancourt moved for directed verdict, claiming that "[t]he State's failed to present a prima facie case." The district court overruled the motion.

Next, Betancourt testified that he was not in Nebraska on or about the day of the offenses. He stated that at that time, he was working 6 days a week or more in Houston.

The jury heard Betancourt's testimony and other evidence concerning the search for Betancourt, his initial arrest in Texas, his deportation, his second arrest, and his ultimate extradition to Nebraska. At trial, the parties essentially established the same facts on these topics as they did at previous hearings.

Betancourt testified that due to his deportation in 2004, he assumed there was no longer a warrant for his arrest in Nebraska at that time. Betancourt admitted that shortly after being deported, he returned to Texas illegally and lived there for almost a decade. He testified that had he been aware of the Nebraska warrant, he did not think he would have returned from Mexico.

After Betancourt rested his case, he made another motion for directed verdict, asserting that no reasonable jury could find him guilty based on the evidence presented. The district court overruled the motion.

The district court held a jury instruction conference. Only the instruction for the conspiracy charge directed the jury to consider whether Betancourt had fled from justice during the period between the offenses and the second arrest, excluding the time Betancourt was incarcerated in Texas prior to being deported. The instructions defined the phrase "fleeing from justice" as "leav[ing] one's usual abode or . . . leav[ing] the jurisdiction where an offense has been [committed], with intent to avoid detection, prosecution, or punishment for some public offense." They advised the jury to find Betancourt not guilty of count III if it concluded that he had not fled from justice.

The jury found Betancourt guilty on all three charges.

Following the verdicts, the district court conducted a mitigation hearing to determine whether mitigating factors existed under Neb. Rev. Stat. § 28-313(3) (Reissue 2016), the presence of which would render the kidnapping conviction a Class II felony rather than a Class IA felony. The district court found that mitigating factors did not exist and that the kidnapping conviction was a Class IA felony.

The district court sentenced Betancourt to life imprisonment for the kidnapping conviction and 10 to 30 years' imprisonment for the use of a weapon to commit a felony conviction, to be served consecutively. Further, the district court treated the conspiracy conviction as a Class II felony and sentenced Betancourt to 30 to 50 years' imprisonment, to be served concurrently with the other sentences.

Betancourt now appeals.

### III. ASSIGNMENTS OF ERROR

Betancourt assigns, rephrased, (1) that the district court erred in failing to quash the amended information because it showed on its face that the 3-year statute of limitations set forth in Neb. Rev. Stat. § 29-110 (Reissue 1995) barred the State's prosecution; (2) that the district court erred in failing to direct a verdict of acquittal because the State failed to produce evidence sufficient to sustain a jury verdict that Betancourt was "fleeing from justice" as provided in § 29-110(1); (3) that his trial counsel provided ineffective assistance by moving for dismissal of his appeal of the district court's denial of his motion for absolute discharge, thereby waiving his right to challenge counts I and II on speedy trial grounds; and (4) that the district court erred in failing to take into account any mitigating factors in sentencing Betancourt.

[1] Further, Betancourt argues, but does not assign, that his counsel was ineffective in failing to investigate, develop, and present exculpatory evidence to support his alibi defense. But an appellate court does not consider errors which are argued but not assigned. *State v. Sellers*, 290 Neb. 18, 858 N.W.2d 577 (2015).

### IV. STANDARD OF REVIEW

[2] Regarding questions of law presented by a motion to quash or plea in abatement, an appellate court is obligated to reach a conclusion independent of the determinations reached by the trial court. See, *State v. Gozzola*, 273 Neb. 309, 729

N.W.2d 87 (2007) (motion to quash); *State v. Bottolfson*, 259 Neb. 470, 610 N.W.2d 378 (2000) (plea in abatement).

[3] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Duncan*, 293 Neb. 359, 878 N.W.2d 363 (2016).

[4] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014).

## V. ANALYSIS

### 1. Motion to Quash

Betancourt contends that the district court erred in overruling his motion to quash the amended information. He argues that the amended information showed on its face that the 3-year statute of limitations set forth in § 29-110 barred the State's prosecution. However, as the State correctly points out, Betancourt's motion to quash was limited to only count III, the conspiracy charge. Because Betancourt's motion to quash references only count III, we shall limit our discussion accordingly.

[5] In addition, Betancourt specifically assigns that the amended information showed *on its face* that the 3-year statute of limitations barred any prosecution. Appellate review is limited to those errors specifically assigned as error in an appeal to a higher appellate court. *State v. Hays*, 253 Neb. 467, 570 N.W.2d 823 (1997). Therefore, we shall treat his motion as one to quash count III based upon the face of the amended information.

[6-8] In Betancourt's challenge to the amended information, he points out that because all relevant events were alleged to have taken place in 2003, the amended information was required to set forth facts that tolled the 3-year statute of limitations. He quotes a civil case, *Broekemeier Ford v. Clatanoff*, 240 Neb. 265, 272, 481 N.W.2d 416, 421 (1992): "'If a petition alleges a cause of action ostensibly barred by the statute of limitations, such petition, in order to state a cause of action, must show some excuse tolling the operation and bar of the statute.'" Quoting *S.I.D. No. 145 v. Nye*, 216 Neb. 354, 343 N.W.2d 753 (1984). However, the controlling *criminal* case is *Emery v. State*, 138 Neb. 776, 777, 295 N.W. 417, 418 (1940), wherein this court held:

> It is generally sufficient in an information to describe the crime charged in the language of the statute and it is not ordinarily necessary to negative the exceptions contained in a statute defining a crime if they are not descriptive of the offense. . . . The statute of limitations is not descriptive of the offense and it is not necessary to plead an exception which makes it inoperative. . . . We think the better rule is that statutes of limitation, as applied to criminal procedure, need not be pleaded and may be raised under the general plea of not guilty.

(Citations omitted.) Therefore, the State is not required to plead an exception to the statute of limitations in a criminal case. But the State, within the information, has the burden to set forth all of the elements of the crime charged. See *State v. Jost*, 219 Neb. 162, 361 N.W.2d 526 (1985). Certainly, that burden required the State to allege that the crime had been committed within the time fixed by law. The amended information in this instance fulfilled these requirements; thus, we conclude that the district court did not err in overruling Betancourt's motion to quash.

## 2. DIRECTED VERDICT

[9] Betancourt assigns that the district court erred in not directing a verdict of acquittal because the State failed to

produce evidence sufficient to sustain a jury verdict that he was "fleeing from justice" as provided in § 29-110(1). Section 29-110 states:

> (1) Except as provided in subsections (2) and (3) of this section, no person or persons shall be prosecuted for any felony . . . unless the indictment for the same shall be found by a grand jury within three years next after the offense shall have been done or committed or unless a complaint for the same shall be filed before the magistrate within three years next after the offense shall have been done or committed and a warrant for the arrest of the defendant shall have been issued . . . . This section shall not extend to any person fleeing from justice.

The phrase "fleeing from justice" means leaving one's usual abode or leaving the jurisdiction where an offense has been committed, with intent to avoid detection, prosecution, or punishment for some public offense. See *State v. Thomas*, 236 Neb. 84, 459 N.W.2d 204 (1990), *disapproved on other grounds, State v. Boslau*, 258 Neb. 39, 601 N.W.2d 769 (1999).

The State contends that this assignment of error, like the previous one, is limited to count III because the issue of "fleeing from justice" applies only to that count, counts I and II having been filed within the statute of limitations. We agree. Because the State filed counts I and II of the amended information within the 3-year statute of limitations, any delay in their prosecution would be reviewed pursuant to a motion to discharge. See Neb. Rev. Stat. § 29-1207 (Reissue 2016). As a result, we shall limit our analysis of this assignment of error to count III of the amended information.

[10] Betancourt essentially challenges the sufficiency of the evidence to support his conspiracy conviction. Prior to trial, Betancourt raised the 3-year statute of limitations set forth by § 29-110 as an affirmative defense to any prosecution for events which occurred in 2003. See *State v. Loyd*, 269 Neb. 762, 696 N.W. 2d 860 (2005) (statute of limitations is affirmative defense). Whether it applied ultimately became a

factual question for the jury to resolve, and the district court properly instructed the jury to consider count III in light of the definition of "flee[ing] from justice." The jury made the factual determination that the evidence was sufficient to show that Betancourt had fled from justice. And an appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998). However, for the sake of completeness, we consider Betancourt's arguments.

[11] Betancourt primarily contends that given the fact he waived extradition back to Nebraska, there is insufficient evidence to support a finding that he was "fleeing from justice." Brief for appellant at 23. In a criminal case, the court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged or (2) evidence is so doubtful in character and lacking in probative value that a finding of guilt based on such evidence cannot be sustained. *State v. Brown*, 235 Neb. 374, 455 N.W.2d 547 (1990). However, under this standard and upon this record, we cannot conclude that the district court erred in overruling Betancourt's motions for directed verdict. There was evidence that upon seeing law enforcement officers near the shed where they had left Pedro, Betancourt and Torres fled to Texas. Subsequently, Betancourt was arrested and waived extradition proceedings, thus showing that he was aware that charges were pending against him in Nebraska. Yet, there is no evidence that Betancourt made any effort to surrender to Nebraska authorities while in custody prior to his deportation or after.

Betancourt further argues that although he did leave the State of Nebraska for Texas, once he was arrested in Texas and waived extradition proceedings, this stopped any tolling

associated with his initial flight. Betancourt relies on *United States v. Gonsalves*, 675 F.2d 1050 (9th Cir. 1982), where the court held that the statute of limitations period is not tolled during the time an accused makes a good faith effort to surrender himself to authorities. However, any efforts by Betancourt to voluntarily surrender to Nebraska authorities ended after he was taken into custody by the immigration services and deported to Mexico.

Betancourt also cites *United States v. Catino*, 735 F.2d 718 (2d Cir. 1982), where the government agreed that a fugitive who executes a formal and voluntary consent to extradition regains the benefit of the statute of limitations. Here, we discern a significant difference between Betancourt's signing a waiver of extradition and actually submitting himself to Nebraska authorities, which he failed to do.

The court in *Catino* further found that the intent to flee from prosecution or arrest may be inferred from a person's failure to surrender to authorities once he learns that charges against him are pending and that "[a] person can be 'fleeing from justice' in one jurisdiction even though in prison in another." 735 F.2d at 722. Both points apply here, in that Betancourt knew about pending charges in Nebraska and we see no distinction between his apprehension by the immigration services and imprisonment in another state.

Further, Betancourt argues:

> [T]he lack of any attempt by Nebraska law enforcement authorities to follow up on Betancourt's whereabouts upon being transferred to [DHS] custody on or after May 17, 2004, further lends support to Betancourt's argument that the State failed to meet its burden to show the statute of limitations was tolled in the case at bar.

Brief for appellant at 24. In support, he cites *U.S. v. Sotelo-Salgado*, 201 F. Supp. 2d 957, 966 (S.D. Iowa 2002), where the court held that it was "fundamentally unfair" to toll a statute of limitations where there was evidence of inaction by the government to locate a wanted person. However, *Sotelo-Salgado*

is distinguishable from this instance because in that case, the federal authorities were notified but took no action to apprehend the fugitive.

In this case, law enforcement immediately attempted to extradite Betancourt. This certainly constitutes immediate action. Moreover, as the State points out, Nebraska had little authority after the immigration services took Betancourt into custody and deported him to Mexico. Nor did Nebraska authorities have the means to detect when Betancourt illegally reentered the United States. In sum, we conclude that because Betancourt did not actually surrender himself to Nebraska authorities after fleeing, in person or through another law enforcement agency, the evidence the State produced was sufficient to sustain a verdict that Betancourt was "fleeing from justice."

Therefore, the district court did not err in overruling Betancourt's motions for directed verdict.

### 3. INEFFECTIVE ASSISTANCE OF COUNSEL

[12,13] We next address Betancourt's allegation that he received ineffective assistance of counsel. We have often said that the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014). The determining factor is whether the record is sufficient to adequately review the question. *Id*. An appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel when raising an ineffective assistance claim on direct appeal. *Id*.

In this instance, Betancourt assigns and argues that his trial counsel was deficient in dismissing his appeal of the district court's order that overruled his motion for absolute discharge on counts I and II. Although Betancourt does not set forth specifically how the district court erred in overruling his motion for absolute discharge on counts I and II,

both his allegations and the record are sufficient to warrant further review.

[14,15] The test for ineffective assistance of counsel is well settled. To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Filholm, supra*. An appellate court may address the two prongs of this test, deficient performance and prejudice, in either order. *Id*. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id*.

[16,17] When a defendant alleges he or she was prejudiced by trial counsel's failure to properly assert the defendant's speedy trial rights on appeal, the court must consider the merits of the defendant's speedy trial rights under *Strickland*. See *State v. Rieger*, 270 Neb. 904, 708 N.W.2d 630 (2006). See, also, *State v. Meers*, 267 Neb. 27, 671 N.W.2d 234 (2003). Only if the motion should have resulted in the defendant's absolute discharge, thus barring a subsequent trial and conviction, could the failure to make a motion for discharge be deemed prejudicial. *State v. Sims*, 272 Neb. 811, 725 N.W.2d 175 (2006).

(a) Statutory Speedy Trial

[18,19] We first consider whether Betancourt's motion for discharge would have been successful under statutory speedy trial grounds. Nebraska's speedy trial statutes require that those who are charged with crimes be brought to trial within 6 months, as calculated by the applicable statute. *State v. Lee*, 282 Neb. 652, 807 N.W.2d 96 (2011). To calculate the deadline for trial under the speedy trial statutes, a court must exclude the day the State filed the information, count forward 6 months, back up 1 day, and then add any time excluded

under § 29-1207(4). *State v. Lee, supra*. If the State does not bring the defendant to trial within the permissible time, the court must order an absolute discharge from the offense charged. *Id.*

[20] In this case, the original information was filed on August 21, 2013. For a felony, the speedy trial clock begins to run on the date that the indictment is returned or the information is filed, not on the date on which the complaint is filed. *Id*. Betancourt filed his motion for absolute discharge on November 14. The district court determined that only 55 days should count against the State pursuant to the speedy trial statute. Based upon the record, we concur. Therefore, trial counsel was not ineffective in not pursuing a meritless argument. See *id.*

### (b) Constitutional Right to Speedy Trial

[21] We next consider Betancourt's contention that his motion for discharge would have succeeded on appeal due to a violation of his right to a speedy trial under U.S. Const. amend. VI and Neb. Const. art. I, § 11. Determining whether a defendant's constitutional right to a speedy trial has been violated requires a balancing test in which the courts must approach each case on an ad hoc basis. This balancing test involves four factors: (1) length of delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant. *State v. Sims, supra*. None of these four factors standing alone is a necessary or sufficient condition to the finding of a deprivation of the right to speedy trial. Rather, the factors are related and must be considered together with other circumstances as may be relevant. *Id.* See, also, *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

[22] In analyzing the prejudice factor of this four-factor test, the U.S. Supreme Court in *Barker v. Wingo, supra*, enumerated three aspects: (1) preventing oppressive pretrial

incarceration, (2) minimizing anxiety and concern of the defendant, and (3) limiting the possibility that the defense will be impaired by dimming memories and loss of exculpatory evidence. Of these three aspects, the third is considered most important "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*, 407 U.S. at 532.

[23] First, we must examine the length of the delay, which acts as the "triggering mechanism." *Id.*, 407 U.S. at 530. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. *Id.* In this matter, the district court found that the 10-year delay from initial arrest until trial was "presumptively prejudicial" and that this factor favored Betancourt, citing *Doggett v. United States*, 505 U.S. 647, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992), and *U.S. v. Erenas-Luna*, 560 F.3d 772 (8th Cir. 2009). We agree that the 10-year delay from initial arrest until trial was "presumptively prejudicial." Therefore, we move to the second factor.

Under the second *Barker* factor, we consider the reasons for the delay and evaluate "whether the government or the criminal defendant is more to blame." *Doggett v. United States*, 505 U.S. at 651. Accord *U.S. v. Erenas-Luna, supra*. Here, the record contains no evidence that the State intentionally or negligently caused the delay. Further, Betancourt's citizenship status led to his deportation to Mexico, which caused the delay. Moreover, as pointed out by the State, with Betancourt knowing of the pending charges, he could have contacted authorities to resolve this case. This second *Barker* factor weighs against Betancourt.

The third *Barker* factor considers whether in due course the defendant asserted his right to a speedy trial. *Doggett v. United States, supra*; *U.S. v. Erenas-Luna, supra*. Again, Betancourt did not assert this right until he returned to Nebraska after a 10-year absence. This third *Barker* factor weighs against Betancourt.

[24] The final *Barker* factor considers whether the defendant suffered prejudice as a result of the delay. *Doggett v. United States, supra*; *U.S. v. Erenas-Luna, supra*. A showing of actual prejudice is required if the government exercised reasonable diligence in pursuing the defendant. *Doggett v. United States, supra*; *U.S. v. Erenas-Luna, supra*. Here, the State promptly attempted to extradite Betancourt but was prohibited by the federal government's deporting him. In addition, it is not reasonable to expect the State to assume that Betancourt would again illegally enter the United States or, if he did reenter, that he would not enter under the scrutiny of federal authorities. Because the State acted diligently to the extent it could, Betancourt must show actual prejudice. He did not offer any instance of prejudice nor argue any presumed prejudice. This factor weighs against Betancourt.

After weighing the totality of the circumstances and the four factors from *Barker v. Wingo, supra*, we conclude that Betancourt's right to a speedy trial under U.S. Const. amend. VI and Neb. Const. art. I, § 11, was not violated. Because Betancourt's motion for absolute discharge lacked merit, trial counsel could not be ineffective by moving for dismissal of Betancourt's appeal of the district court's denial of that motion.

### 4. MITIGATING FACTORS AT SENTENCING

[25,26] Betancourt challenges his sentence on count I, the kidnapping conviction. Section 28-313(3) provides, "If the person kidnapped was voluntarily released or liberated alive by the abductor and in a safe place without having suffered serious bodily injury, prior to trial, kidnapping is a Class II felony." The provisions of § 28-313(3) are mitigating circumstances which may reduce the penalty for kidnapping and are therefore a matter for the court at sentencing, not the jury. See *State v. Becerra*, 263 Neb. 753, 642 N.W.2d 143 (2002). Rescue is not a voluntary release of a kidnapping victim. *State v. Delgado*, 269 Neb. 141, 690 N.W.2d 787 (2005).

Betancourt contends, "Because the evidence at trial showed that [Pedro] was voluntarily released, alive, . . . in a safe place without having suffered any bodily injury whatsoever . . . , the mitigating factors set forth in . . . § 28-313(3) were satisfied." Brief for appellant at 30. Consequently, he argues that the district court should have treated the kidnapping conviction as a Class II felony, resulting in a sentence to a term of years rather than life imprisonment.

The evidence at trial reflected that after Betancourt and Torres had kidnapped Pedro, bound him with tape and "shoestring type cord," gagged him, and threatened him with a gun, they placed him in a shed. Pedro testified that Betancourt told him that he was going to leave him there, bring Jose to the same location, and then kill them both. Pedro advised that Betancourt and Torres had not injured him or tethered him to anything inside the shed and that the doorway to the shed was open. Pedro, still bound, managed to stand and jump to the nearest house, where officers found him. Based on these facts, the district court found count I to be a Class IA felony, because Betancourt did not voluntarily release Pedro, who instead escaped through his own efforts.

Pedro's ability to effectuate an escape despite being bound and gagged does not equate with a voluntary release. Accordingly, we conclude that the mitigating factors in § 28-313(3) were not present, because the rescue was not a voluntary release, and that the district court did not err in finding count I to be a Class IA felony.

## 5. PLAIN ERROR

[27] Finally, although the State did not file a cross-appeal contending that the sentence imposed was excessively lenient, it urges us to recognize plain error. The State argues that the district court committed plain error in the classification of, and the sentence for, count III, the conspiracy conviction. Plain error exists where there is error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature

that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Aguallo*, 294 Neb. 177, 881 N.W.2d 918 (2016).

The State points out that Neb. Rev. Stat. § 28-202(4) (Reissue 2008) provided, "Conspiracy is a crime of the same class as the most serious offense which is an object of the conspiracy, except that conspiracy to commit a Class I felony is a Class II felony." Here, the most serious offense which was an object of the conspiracy was kidnapping, a Class IA felony. See § 28-313(2). Therefore, count III, the conspiracy conviction, was a Class IA felony and had a mandatory sentence of life imprisonment. See Neb. Rev. Stat. § 28-105 (Reissue 2008). The district court erroneously treated count III as a Class II felony and sentenced Betancourt to 30 to 50 years' imprisonment.

[28] We digress to note that Betancourt acknowledges this mistake, but argues that the district court incorrectly advised him at the arraignment hearing using the classification and penalty above, and that he relied on the incorrect advisement to his detriment, resulting in the violation of his due process rights. He cites *State v. Schnell*, 17 Neb. App. 211, 220, 757 N.W.2d 732, 739 (2008), for the proposition that "[w]here a defendant was unaware of the penal consequences of his or her guilty plea because he or she had been misinformed by the court, his or her plea is not voluntary." Citing *State v. Golden*, 226 Neb. 863, 415 N.W.2d 469 (1987). However, both *Schnell* and *Golden* are distinguishable from the case at hand because they involved pleas. Here, Betancourt pled not guilty and went to trial. Where a defendant pleads not guilty at arraignment and proceeds to trial, "the considerations involved in determining whether one freely, intelligently, voluntarily, and understandingly pleads guilty have no application . . . , for in such a circumstance, the defendant does not surrender the constitutional rights inherent in a trial." *State v. McBride*, 252 Neb. 866, 876, 567 N.W.2d 136, 144 (1997). Because

Betancourt proceeded to trial, there has been no violation of his due process rights.

Turning again to plain error, where, after a conviction following a jury trial, the trial judge imposed an incorrect sentence, we have found plain error and ordered the trial court to correct the sentence. See *State v. Thorpe*, 280 Neb. 11, 26, 783 N.W.2d 749, 762 (2010) (remanding with directions to resentence to life imprisonment because "life imprisonment without parole" was not a valid sentence for first degree murder). In this instance, the incorrect sentence constituted plain error, and we remand for imposition of a sentence of life imprisonment.

## VI. CONCLUSION

Having found no merit to Betancourt's assigned errors, we affirm his convictions for counts I, II, and III and his sentences for counts I and II. However, because we find plain error in the sentencing for count III, we vacate that sentence and remand the matter to the district court with directions to resentence Betancourt to "life imprisonment" for count III.

AFFIRMED IN PART, AND IN PART VACATED
AND REMANDED FOR RESENTENCING.